IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | | |
|---|---|---|
| BRIAN TOOTLE, | ) | |
| | ) | |
| Plaintiff | ) | 1:20-CV-00235-SPB-RAL |
| | ) | |
| vs. | ) | SUSAN PARADISE BAXTER<br>United States District Judge |
| | ) | |
| CORRECTIONAL OFFICER LONG, | ) | RICHARD A. LANZILLO<br>Chief United States Magistrate Judge |
| | ) | |
| Defendant | ) | |
| | ) | REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT |
| | ) | IN RE: ECF NOS. 38, 45 |
| | ) | |

## I. Recommendation

It is respectfully recommended that Defendant's motion for summary judgment (ECF No. 38) be denied and that Plaintiff's cross-motion for summary judgment (ECF No. 45) also be denied.

## II. Report

Plaintiff Brian Tootle ("Tootle") is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC") at its State Correctional Institution at Forest ("SCI-Forest"). ECF No. 14. He brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Long ("Long"), a corrections officer at SCI-Forest, alleging that he violated his right to freely exercise his religion when he confiscated his religious materials and denied him access to certain texts during his incarceration in SCI-Forest's Restricted Housing Unit ("RHU"). *Id.*, ¶ 1.

Pending before the Court are Long's motion for summary judgment (ECF No. 38) and Tootle's cross-motion for summary judgment (ECF No. 45).

**A. Procedural Background**

Tootle's complaint was filed with the Court on September 29, 2020. ECF No. 14. Asserted against Long in his individual capacity, the complaint alleges that Long denied Tootle access to his religious materials while he was in the RHU in violation of his rights under the Free Exercise Clause of the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *Id*., ¶¶ 14-17.

Long moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 21, 22. On July 19, 2021, the undersigned issued a Report and Recommendation recommending that Long's motion to dismiss be denied as to Plaintiff's First Amendment claim but granted as to Plaintiff's RLUIPA claim as much as such claim was brought against Long in his individual capacity and for monetary damages. The undersigned further recommended that Tootle be granted leave to amend his complaint within thirty days of the Order to assert his RLUIPA claim against Long in his official capacity and for injunctive and/or declaratory relief only. ECF No. 26. Neither party filed objections to the R&R, and the district court adopted the R&R on August 13, 2021. ECF 27.

Because Tootle did not file an amended complaint by October 19, 2021, the Court dismissed Tootle's RLUIPA claim with prejudice and ordered Long to answer the remaining claims. ECF 29. Long answered the complaint (ECF No. 31) and, following discovery, he filed a timely motion for summary judgment (ECF No. 38), brief in support of the motion (ECF No. 39), concise statement of material facts (ECF No. 40), and appendix to the concise statement of facts (ECF No. 41).

Tootle then cross-moved for summary judgment (ECF No. 45) and filed a brief in support of the motion (ECF No. 46), and concise statement of material facts with numbered exhibits (ECF No. 47).  In accordance with Local Rules of the Court 56(C), Long filed a timely response to Tootle's summary judgment motion (ECF No. 50) and response to his concise statement of material facts (ECF No. 51).  *See* LCvR 56(C).[1]

On July 28, 2022, the Court ordered Tootle to show cause as to why he had not filed a memorandum in opposition to Long's summary judgment motion, responsive concise statement of material facts, and appendix to the responsive concise statement, pursuant to Local Rule 56(C).  ECF No. 52.  Tootle timely responded to the show cause order, writing that he had "timely filed his response to Defendant's Motion for Summary Judgment on June 21, 2022," when he filed his cross-motion for summary judgment and accompanying materials.  ECF No. 53.  The Court then issued a response order, explaining that Tootle's cross-motion for summary judgment neither qualified as nor excused the response requirements enumerated in LCvR 56(C), and granted Tootle an extension to file his opposition documents.  ECF No. 54.  On October 14, 2022, the Court received Tootle's timely response in opposition to Long's motion for summary

---

[1] LCvR 56(C) Within 30 days of service of the motion for summary judgment, the opposing party shall file:

    1. A Responsive Concise Statement. A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

        a. admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;

        b. setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (See LCvR 56.B.1 for instructions regarding format and annotation); and

        c. setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment;

    2. Memorandum in Opposition. The memorandum of law in opposition to the motion for summary judgment must address applicable law and explain why there are genuine issues of material fact to be tried and/or why the moving party is not entitled to judgment as a matter of law; and

    3. Appendix. Documents referenced in the Responsive Concise Statement shall be included in an appendix. (See LCvR 56.B.3 for instructions regarding the appendix).

judgment (ECF No. 55), supporting brief (ECF No. 56), responsive concise statement of material facts (ECF No. 57), and appendix with exhibits A-D (ECF No. 58).

**B. Factual Background**

The following factual recitation is derived from each parties' concise statement of material facts and the indisputably authentic exhibits to each. ECF Nos. 14,[2] 40, 41, 57, 58, 47, 51. Disputed facts are noted.

On "May 11, 2019, [Tootle] was escorted to the RHU" because of a misconduct report,[3] and at his misconduct hearing four days later, he was found guilty of "disobeying an order" and sentenced to fifteen days in the RHU. ECF Nos. 40, ¶¶ 11, 12, 25; 47, ¶¶ 11, 13. He was released thirteen days later on May 23, 2019. ECF Nos. 40, ¶ 25; 47, ¶¶ 13.

Tootle is a Muslim. ECF Nos. 47, ¶ 19; 51, ¶ 19. Tootle asserts that before arriving at the RHU, he packed "his Noble Qur'an, two Mushaf's (the all Arabic Qu'ran)," and "a multitude of religious texts." ECF Nos. 47, ¶ 12; 51, ¶ 12. Long generally disputes this but concedes that he noted "self-pack" on Tootle's personal property sheet the day Tootle arrived at the RHU (May 11, 2019). ECF Nos. 47, ¶ 12; ECF No. 51, ¶ 12. That said, "[Tootle's] property was not inventoried while" he was "in the RHU," which is also noted on his personal property sheet. ECF Nos. 47, ¶ 16; 51, ¶¶ 12, 16. Upon leaving the RHU, Tootle would not sign this sheet–he

[2] The Court treats Tootle's complaint as an affidavit for purposes of opposing a summary judgment motion because Tootle concluded his Complaint by adding and signing the following declaration "I have read the foregoing complaint and hereby verify that the matter alleged therein are true, as to matters alleged on information and belief, I believe them to be true and correct." ECF No. 1-3, p. 2. *See, e.g.*, Reese v. Sparks, 760 F.2d 64, 67, 67 n.3 (3d. Cir. 1985).

[3] The Court notes that in Defendant's responsive concise statement of material facts, Long "denie[s] as stated" that "[Tootle] was escorted to the [RHU]," and admits only that "[Tootle] was confined in the [RHU]." ECF Nos. 40, ¶ 11; 51, ¶ 11. But in paragraph 25 of Long's concise statement of material facts, he writes, "May 11, 2019, Plaintiff was escorted to the RHU." ECF Nos. 40, ¶ 25. Accordingly, the Court finds that Long does not genuinely dispute Tootle's statement that he was "escorted" to the RHU. This fact, however, does not appear to be material to resolution of the pending motions.

contends this was because Long refused to inventory his property. ECF No. 47, ¶ 16. Long admits that Tootle's property was not inventoried, but disputes that this was his doing. ECF No. 51, ¶ 16.

In 2019, Ramadan began on the evening of May 5 and ended on the evening of June 3. ECF No. 40, ¶ 24. Tootle was in the RHU for thirteen days of Ramadan. ECF No. 57, ¶ 31. Tootle asserts that Long denied his requests for his religious materials during that time, and consequently, that "[he] was not able to practice his religion for 13 days." ECF Nos. 47, ¶¶ 14, 15; 14, ¶11, 15; 57, ¶ 27. Long denies that Tootle was prohibited from practicing his religion." ECF No. 51, ¶¶ 14, 15.

Tootle had access to his religious materials upon release from the RHU. ECF No. 47, ¶ 48. Shortly after, Tootle filed Grievance No. 804559, alleging that he was sent to the RHU in retaliation for past grievances he had filed, and that denying him his religious materials while he was in the RHU exemplified continued retaliation, in violation of his First Amendment right to free exercise of religion. ECF No. 40, ¶ 13; ECF No. 41-1, Ex. C, pp. 14-23 (Grievance No. 804559 record). This is the only grievance Tootle filed that relates to incidents alleged in this action. ECF No. 40., ¶ 23.

**C. Standard of Review**

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A

disputed fact is "material" if proof of its existence or nonexistence would affect the outcome under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am*., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn from it in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp*., 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co*., 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp*., 967 F.2d 846, 851 (3d Cir. 1992).

The court applies the foregoing standards no differently when reviewing cross-motions for summary judgment. *Lawrence v. City of Phila*., 527 F.3d 299, 310 (3d Cir. 2008). "'Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id*. (quoting *Rains v. Cascade Indus., Inc*., 402 F.2d 241, 245 (3d Cir. 1968)). If review of cross-motions reveals no genuine issue of material fact, then judgment may be granted in favor of the party entitled to judgment in view of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

**D. Analysis**

The sole claim remaining in this action is Tootle's contention that Long violated his First Amendment rights by refusing to give him his religious materials for the thirteen days he was in the RHU, which coincided with the Islamic celebration of Ramadan. Each party maintains that he entitled to summary judgment on procedural and substantive grounds. First, Long argues that Tootle did not properly exhaust his administrative remedies regarding this claim; Tootle asserts that he did. Second, Long argues that the record cannot support a finding that Tootle's religious materials were required for the exercise of his sincerely held religious beliefs or that the temporary deprivation of his materials substantially burdened the exercise of his religion, and that the prison regulation responsible for limiting inmates' access to materials serves a legitimate penological interest. Tootle asserts that the record sufficiently demonstrates a substantial burden on his religious rights and that the evidentiary record does not establish a legitimate penological interest underlying denial of his religious materials.

### 1. Exhaustion of Administrative Remedies under the Prison Litigation Reform Act

"The Prison Litigation Reform Act of 1995 (PLRA) requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court." *Woodford v. Ngo*, 548 U.S. 81, 81 (2006). The stringent exhaustion requirement allows "an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,'" and promotes the efficient, prompt, and economical resolution of claims at the administrative level. *Id*. at 89. The failure of an inmate to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

Furthermore, the PLRA requires "proper exhaustion," meaning "complet[ing] the administrative review process in accordance with the applicable procedural rules." *Woodford*, 548 U.S. at 88. The individual prisons supply these procedural rules. *Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim ... is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). In Pennsylvania's state prison system, grievance procedures and rules are set out in DOC Policy DC-ADM 804.

To properly exhaust, Inmate Grievance Policy DC-ADM 804 requires an inmate to complete three stages: (1) initial review; (2) appeal; and (3) final review. *See* Grievance System Policy DC ADM-804; *Smith v. Sec. of Pa. Dept. of Corrections*, 2018 WL 279363, at *2 (W.D. Pa. Jan. 3, 2018). First, within fifteen days of the incident, the inmate must "legibly set forth all facts and identify all persons relevant to his claim in a grievance" submitted for review by the

facility manager or the regional grievance coordinator, who, in turn, must respond in writing within fifteen business days. *Smith*, 2018 WL 279363, at *2 (citing *Spruill*, 372 F.3d at 233). Second, if the inmate disagrees with the response, he may appeal to the Facility Manager within fifteen working days; the Facility Manager then has fifteen working days to respond to the appeal. *See Jackson v. O'Brien*, 2021 WL 5087922, at *3 (W.D. Pa. Nov. 2, 2021). Finally, if the inmate remains dissatisfied, he has fifteen working days to appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), which then must issue a final determination within thirty working days. *See Downey v. Pa. Dep't of Corrs.*, 968 F.3d 299, 305-06 (3d Cir. 2020). As the record for Grievance No. 804559 demonstrates, Tootle timely completed each of these steps and received a final determination from SOIGA denying his grievance. ECF No. 41-1, Ex. C, pp. 14-23 (Grievance No. 804559 record).

Proper exhaustion extends as well to the substance of the grievance. Neither the PLRA nor DC-ADM 804 has a "name all defendants" requirement. *See Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 217); *Barclay v. Stabley*, 2021 WL 463651, at *4 (M.D. Pa. Feb. 9, 2021) ("There is no requirement in DC-ADM 804 that a prisoner must name the individuals that were involved"). But Section 11(d) of DC-ADM 804 mandates that the inmate "shall identify individuals directly involved in the events." *See Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); *Jackson v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020). Because the identification requirement is mandatory, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that

[plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA").

The purpose of this stringent application of the exhaustion requirement is to alert the prison officials to a problem and allow the officials to remedy the problem before it is litigated in court; it is "not to provide personal notice to a particular official that he may be sued." *See Williams v. Beard*, 482 F.3d 637, 640 (3d. Cir. 2007) (quoting *Jones*, 549 U.S. at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)). Thus, "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." *Jones*, 549 U.S. at 219. As such, courts in the Third Circuit have found that inmates may adequately identify individuals in a grievance without using their names. For example, "[i]dentifying someone by position has been held to fulfill the DC-ADM 804's identification requirement." *Travillion v. Wetzel*, 765 Fed. Appx. 785, 789 (3d Cir. Apr. 8, 2019) (citing *Johnson v. Johnson*, 385 F.3d 503, 523 (5th Cir. 2004) (noting "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice)). *See also Diaz v. Palahovich*, 448 Fed. Appx. 211, 217 (3d Cir. Oct. 4, 2011) (determining that inmate's identification of "mailroom staff," along with grievance officer's subsequent interview of mailroom employees, obviated any procedural default that may have resulted from failure to specifically name mailroom employees). A plaintiff's failure to name individuals in his grievance has also been excused where the prison conducts an internal investigation and relies upon that investigation in its grievance response. *See Chaney v. Bednard*, 2020 WL 7864202, at *3 (W.D. Pa. Dec. 31, 2020); *Martin v. Secretary of Corrections*, 2018 WL 1158250, at *4 (M.D. Pa. Mar. 5, 2018); *Schultz v. Doher*, 335 F.Supp.3d 177, 185 (D. Mass. 2018). And a prison excuses an inmate's

procedural default when its response to the grievance "identif[ies] the unidentified persons and acknowledg[es] that they were fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234-35; *see Williams v. Beard*, 482 F.3d 637, 639-40 (3d Cir. 2007); *Robinson v. Johnson*, 343 Fed. Appx. 778, 782 (3d Cir. 2009); *Tenon v. Dreibelbis*, 606 Fed. Appx. 681, 687 n.5 (3d Cir. 2015); *Richardson v. Folino*, 2012 WL 6552916, at *14 (W.D. Pa. Dec. 14, 2012) (Plaintiff properly exhausted where grievance listed items he was deprived of but not the name of the person responsible for the deprivation, but the prison response named Defendant as the responsible party).

Long argues that Tootle did not properly exhaust his administrative remedies because he failed to identify Long and sufficiently state a First Amendment claim in the grievance record. ECF No. 39, p. 6-8. Additionally, Long contends that Tootle filed the grievance too late for prison officials to investigate the issue. *Id.*, p. 9. The Court disagrees on each point.

In his initial grievance, Tootle first lists five legal claims, the second of which states: "Infringement upon Exercising My Religion: in violation of my 1st Amendment right of the U.S. Const, $1,000,000." ECF No. 41-1, Ex. C, p. 16 (Initial Grievance Form). On a separate paper, Tootle details the subject of his grievance, and begins by listing officers that "[t]his Grievance is for," including "C/O Long." *Id.* at p. 17. He then asserts that he was only sent to the RHU because of a lie told by an officer, Sgt. Barger, in retaliation for his prior grievances, and that "[s]uch retaliation caused me severe pain, misfortune and traumatized me." *Id.* The grievance then reads in pertinent part as follows:

> Firstly I went to the RHU for something I didn't do, & the day before I went I found out my grandmother almost died from the Sepcis, while in the RHU I received none of my property except the basics, *none of my religious material while this is month of Ramadan*, my appeal got denied also, and I lost my job as Unit Maintenance worker & Activities Trainer.

> As a result of such devastating circumstances & retaliator conduct, I seek the following relief of Monetary Damages, see pate #1 or 2.

*Id*. (emphasis supplied)

An initial review of these allegations may overlook the religion claim, as it is sandwiched among several other complaints and appears to form part of a parallel retaliation claim. Nevertheless, Tootle's grievance fairly raises a First Amendment free exercise claim when it complains that he "received none of . . . [his] religious material while this is month of Ramadan." *See Johnson*, 385 F.3d at 518 ("The grievances are certainly not as explicit as one would expect from a lawyer, but . . . a prisoner need not provide all of the elements of a constitutional claim as long as the grievance at least reasonably indicates a problem.").

Tootle's appeals continued to press his free exercise claim. In the Initial Review Response, the Facility Grievance Coordinator characterizes Tootle's grievance only as "alleg[ing] that he received a misconduct as retaliation for past grievances," and asserts that he seeks one million dollars for "this alleged conspiracy." *Id.*, p. 18. In his subsequent Appeal to the Facility Manager/Designee, Tootle first points out that the Facility Grievance Coordinator "misinterpreted the relief [he] seek[s]," and then reasserts the alleged retaliatory conduct, after which Tootle asks:

> If this wasn't retaliation, then what was the reason for *depriving me of my property while in the RHU, specifically my religious material?? It's known that I am very attentive to my religion. So by denying me such a significant practice during the sacred month of Ramadan, was a devastating blow to me.*

*Id.* (emphasis supplied). Tootle concludes the appeal with the list of five claims enumerated in his Initial Grievance Form, including: "2) INFRINGEMENT UPON ME EXERCISING MY RELIGION, $1,000,000." *Id*. at p. 19. Again, the Facility Manager's Appeal Response did not

address the religious infringement allegation, summarizing the grievance only as "regarding a misconduct and the associated charges" and determining that "[t]he initial response thoroughly addressed the issues raised in [the] grievance." *Id.*, p. 21.

Tootle's final appeal to SOIGA again seeks to clarify the subject-matter of his appeal and affirm his attempt to raise a First Amendment claim. He writes:

> My grievance is not about the misconduct charge or conduct of the hearing . . . Rather, my grievance is based on the intentional retaliation, which brought about the false charges, which led to my pain and suffering and inconvenience! . . . The surrounding circumstances a make the retaliation clear . . . I was escorted to the RHU. This was a traumatizing and very painful and emotional event that I suffered to. Due to it taking place in **RAMADAN** a blessed month that I was looking forward to since last year. Further evidence which proves retaliation, is the RHU staff not providing me with any of my religious material or my property during my 13days in the RHU. Thus infringing upon me exercising my religion . . .

*Id.*, p. 22. Tootle ends again by listing his five claims, this time in all capitals, underlined, and bolded, including: "**2) INFRINGEMENT UPON ME EXCERCISING MY RELIGION, $1,000,000.**" *Id.*, p. 23. This time, the summary section of the response iterates Tootle's religious assertions; however, SOIGA brushes the conduct off as a consequence of an inmate's poor behavior:

> In your grievance, you ultimately claim that you were issued a misconduct report in retaliation for grievances that you had filed. You assert that while in the RHU for 13 days, you were without religious materials . . . When inmates violate prison rules, there are certainly consequences . . . not having access to everything they possessed in general population can certainly happen.

*Id.*, p. 14.

Long argues that Tootle has only "vaguely mention[ed] 'religious materials' amidst a list of other circumstances and never uses the word Quran," and so "it would be impossible for a prison official to discern that Plaintiff was requesting that he have access to his Quran while he

was in the RHU." ECF No. 39, p. 8. The Court does not regard Tootle's failure to specifically identify a Quran among the "religious materials" he was denied in the RHU as a fatal flaw in his grievance. Without question, a Quran falls within the scope of "religious material." *See, e.g.*, *Sutton v. Rasheed*, 323 F.3d 236, 241-242, 244 (3d. Cir. 2003) (emphasis added) (Phase II of SCI-Camp Hill's SMU program "permitted legal materials, a Bible or Quran, and four *other* religious reading materials . . . Phase III permitted two religious texts *in addition to* the Quran . . . Phase IV of the SMU program . . . permitted access to a Bible, Quran *or 'equivalent religious text*.'"). Given the foregoing, Tootle clearly placed prison officials on notice that he was asserting a First Amendment free exercise of religion claim in his grievance.

Long also argues that Tootle failed to identify him in the grievance. ECF No. 39, p. 7. But Long's name appears twice in the Initial Grievance Form. First, Tootle begins his grievance narrative with the following introductory line: "This Grievance is for SCI Forest Administration and Staff as follows, . . . . C/O Long, plus all RHU Staff." *ECF No. 41.*, p. 17. And second, Long is one of the officers listed under the prompt that states "List actions and staff you have contacted, before submitting this grievance." *Id*., p.16. *See also* ECF No. 41-1, p. 39 (DC-ADM 804, Inmate Grievance System Procedures Manual, Section 1 - Grievance & Initial Review) ("An inmate is encouraged to attempt resolution of a concern informally . . . with a Unit Manager or Officer-in-Charge prior to submitting a DC-804, Part 1, Official Inmate Grievance Form").[4] Further, in his Appeal to Final Review, Tootle writes that the "RHU staff" did "not provide me with any of my religious material." Based on various documents in the record, it appears that Long falls within the scope of "RHU staff." *Id.*, p. 22. *See Travillion*, 765 Fed. Appx. at 789 (3d

[4] Of note is that before "[t]he policies of the Pennsylvania Inmate Grievance System were amended in 2010," "[t]he provision requiring inmates to identify individuals" used to state only that "[t]he inmate will identify any person(s) who may have information that could be helpful in resolving the grievance." *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013).

Cir. 2019) ("RHU Staff and Unit Management" and "SCI-Rockview staff and/or administration" are sufficient identifiers for exhaustion purposes). Thus, Grievance No. 804559 sufficiently identifies Long. *See Henry v. Lamoreaux*, 2018 WL 3037180, at *3 (W.D. Pa. June 19, 2018) (the fact that each Defendant "was identified by name at least once during the grievance process . . . was sufficient to put prison officials on notice that each of the Defendants was claimed to be guilty of wrongdoing, thus satisfying the aim of DC–ADM 804").

Long buttresses his argument by correctly observing that "[t]here is no indication in the grievance record that prison administrators knew that defendant Long was involved in the alleged conduct." ECF No. 39, p. 7. In fact, there is no indication that prison administrators addressed Tootle's religious infringement allegation at all, and thus it is impossible to deduce what prison administrators knew. That said, the record shows that even a cursory investigation of Tootle's free exercise claim would reveal Long's involvement, as he is one of only two officers who signed Tootle's personal property sheet. ECF No. 47-2, Ex. A. *See* ECF Nos. 47, ¶ 12; 51, ¶ 12. *See, e.g.*, *In v. Stroup*, 2021 WL 5922331, at *6 (W.D. Pa. Dec. 15, 2021) (Defendant saw Plaintiff many times about his condition, "which was documented in [Plaintiff's] medical records;" thus, "the Grievance Officer investigat[ing] this claim . . . should have noted [Defendant's] significant involvement from those record."). Long's concessions "that on May 11, 2019, [he] wrote 'self pack' on Plaintiff's personal property sheet," his related admission that Tootle's property was not inventoried and that Tootle refused to sign the property sheet upon release, and his signature on the property sheet dated the day of Tootle's RHU release, buttress this conclusion. Because Tootle's grievance alerted officials to the nature of his First Amendment free exercise claim, and because Long's involvement in this alleged problem was clearly identifiable, the grievance satisfies its primary purpose – "to alert prison officials to a

problem, not to provide personal notice to a particular official that he may be sued." *Williams*, 482 F.3d at 640 (3d Cir. 2007) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007) (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)).  *See also Robinson v. Johnson*, 343 Fed. Appx. 778, 781–82 (3d Cir. 2009) (Defendants were neither identified in the grievance nor in the prison's response, but the prison's response acknowledging the issue and that policy had since changed sufficiently evidenced the prison's knowledge of the problem); *Newsome v. Teagarden*, 2021 WL 702043, at *4 (W.D. Pa. Feb. 23, 2021) ("Because [Plaintiff's] grievance alerted DOC officials of the nature of his claim regarding Defendants' use of excessive force during the April Incident, he is not barred from bringing suit against CO Teagarden, Lt. Efaw, and Sgt. Bowlin even though they were not named in his grievance.").

As a final argument in support of his exhaustion defense, Long submits that the "issue was moot" by the time Tootle filed the grievance because he had been released from the RHU, and thus it was "too late for prison officials to perform an investigation." ECF No. 40, ¶ 37.  *See* ECF No. 39, p. 9.  Long misconstrues when a matter is considered "moot" and mis-interprets the "issue" presently in question.  The issue–whether Long infringed on Tootle's First Amendment rights to free exercise of religion–is not moot in the constitutional sense; that is, his release from the RHU did not "makes it impossible for the court to grant 'any effectual relief whatever.'" *Ghana v. Holland*, 226 F.3d 175, 185 (3d Cir. 2000) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  Indeed, Tootle explicitly requests monetary damages as relief in his grievance; a transfer to another prison does not moot a claim for damages, let alone release from the RHU.  *See, e.g.*, *Abdul–Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir.1993); *Weaver v. Wilcox*, 650 F.2d 22, 27 (3d Cir.1981).

Moreover, a grievance is not procedurally deficient just because the alleged conduct has ceased by the time the grievance is filed.[5] *See, e.g.*, *Fulton v. Hakinberry*, 2015 WL 5098751, at *4 (W.D. Pa. Aug. 31, 2015) ("Plaintiff's claims, insofar as they arise from conduct that occurred within the 15 days of the date he filed his grievance, have been exhausted."); *Corbin v. Bickell*, 2014 WL 3590000, at *6 (M.D. Pa. July 21, 2014) ("Defendants respond by arguing that Plaintiff did not exhaust his administrative remedies since he did not file his grievance within fifteen days of the event upon which the claim was based."); *id.* (discussing *Johnson v. Johnson*, 385 F.3d 503, 519 (5th Cir. 2004) ("Fifth Circuit treated inmate's grieved 'assaults as discrete events and found that due to the fifteen-day grievance procedure requirement, the plaintiff exhausted his claims arising from conduct that occurred within fifteen days from which the grievance was filed.'"). In fact, "[a] purpose of the [PLRA] was to insure that prisons . . . are given the opportunity to respond to prisoner complaints, particularly legitimate complaints, so that injuries are prevented in the *future*." *Nyhuis v. Reno*, 204 F.3d 65, 70 (3d Cir. 2000) (quoting *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir.1999)). And as the Third Circuit has expressed,

> '[e]ven if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice' or fashion some other remedy, such as . . . reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards.

*Id.* (quoting *Alexander v. Hawk*, 159 F.3d 1321, 1327 (11th Cir. 1998). *See Sides v. Pennsylvania Dep't of Corr.*, 2020 WL 1493549, at *8 (W.D. Pa. Mar. 27, 2020) (quoting *Jones*, 549 U.S. at 219) (emphasis added) ("the Supreme Court has 'identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit, *reducing litigation* to the extent complaints are satisfactorily resolved, and *improving*

[5] If that were true, an inmate's grievance alleging physical abuse would be procedurally deficient unless the inmate wrote and filed the grievance during the alleged the assault.

*litigation* that does occur by leading to the preparation of a useful record.'"). Accordingly, Grievance No. 804559 was administratively exhausted because its subject-matter should have put prison officials on notice of Tootle's First Amendment free exercise of religion claim and Defendant Long's alleged involvement in the claim. The Court will now proceed to analyze whether the record is sufficient to support the substantive elements of Tootle's First Amendment claim.

**2. First Amendment Claim**

Long also argues that he is entitled to judgment as a matter of law on Tootle's First Amendment free exercise claim because the record is insufficient to show that Tootle required his religious materials to adhere to his religious beliefs or that denying these materials during Ramadan substantially burden his religious beliefs. Long also maintains that denying Tootle his religious materials while he was in the RHU was reasonably related to a legitimate penological interest.

The free exercise clause of the First Amendment provides, *inter alia,* that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend. 1. The United States Supreme Court has explained that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (citations omitted). That said, only beliefs considered sincerely held and religious in nature receive constitutional protection, and "the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc); *see Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972).

Here, the record supports that Tootle practices the Islamic faith, it was Ramadan while he was in the RHU, and "[r]eading/[r]eciting the Qur'an is a required practice in Islam, especially during the blessed month of Ramadan, as Ramadan is also called 'The Month of the Qur'an.'" ECF No. 47, ¶ 20; *see* ECF Nos. 47, ¶ 19, 20; 51, ¶ 19, 20; 39, p. 9; 47-1, Ex. D (Important Lessons for RAMADAN).  Tootle claims that Long's alleged refusal to provide him his religious texts while he was in the RHU violated his free exercise rights under the First Amendment, and specifies that "Long's refusal to provide [him] with his Qur'an" substantially burdened his "practice[] and expressi[on]" of "his religious belief." ECF No. 14, 8, 11, 15. Long has the burden of demonstrating that no genuine issue of material fact exists as to whether Tootle's belief was sincerely held and religious in nature, and if so, whether a prison regulation or official's action substantially burdened his belief.  *See* Fed. R. Civ. P. 56(a).  Long has not met this burden.

First, Long provides no evidence to support his assertion that "[Tootle] was able to practice his religion at all times during the period of Ramadan." ECF No. 40, ¶ 31.  Second, Long erroneously invokes this Court's holding in *Enoch v. Perry*, 2019 WL 2393783 (W.D. Pa. 2019) when arguing that Tootle's sincerely held beliefs did not require access to his religious texts.  ECF No. 39, p. 10.  As Long correctly explains, the Court dismissed the *Enoch* plaintiff's claim that his First Amendment right to practice the Fellowship of Science, a religion he founded and led, was violated when Defendants refused him his prayer rug while he was in the RHU because he did not provide sufficient "evidence explaining why he need[ed] such a rug or how it [wa]s connected to or a required component of his faith." *Enoch*, 2019 WL 2393783, at *4, *6; ECF No. 39, p. 10.  In contrast, Tootle specifically identifies the Qur'an as "the most important book in Islam" (the Qur'an), and explicitly details why the Qur'an was a required component of

his faith during his confinement in the RHU (e.g., "according to Islamic Creed, The Qur'an is . . . a strongly recommend practice to read and study during the Blessed Month of Ramadan"). ECF No. 14, ¶ 13; *see* ECF Nos. 14, ¶¶ 8, 12, 15(1); 47, ¶¶ 19-22; 46, p. 10-11 (quoting *Sutton*, 323 F.3d 236). Indeed, Long admits that "[r]eading/[r]eciting the Qur'an is a required practice in Islam, especially during the blessed month of Ramadan." ECF No. 51, ¶ 20. Accordingly, whether Tootle required his religious materials and whether denying him these materials, including the Qur'an, during the month of Ramadan substantially burdened his religious belief remain a genuine issue of material fact. *See Washington v. Klem*, 497 F.3d 272, 282 (3d Cir. 2007) (DOC policy limiting number of books inmate could keep in their cell substantially burdened inmate's religious practice); *Dunn v. Sec'y Pennsylvania Dep't of Corr.*, 490 Fed. Appx. 429, 431, 432 (3d Cir. 2012) ("Dunn's right to practice [Wiccan] was not substantially or significantly burdened" where "[he] was denied possession of certain items" but retained "possession of certain religious objects and books."); *Noble v. Wetzel*, 2020 WL 3211893, at *5 (W.D. Pa. May 11, 2020) (inmate had stated a plausible Free Exercise claim and RLUIPA claim when prison officials confiscated religious material from him, including books); *Boone v. Commissioner of Prisons*, 1994 WL 383590, at *8 (E.D. Pa. Jul. 21, 1994) (inmate's free exercise rights were not substantially burdened where officers seized some of inmate's religious materials but left his Bible and "other purely religious books and documents").

Still, a prison policy or regulation that burdens an inmate's First Amendment rights "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether the policy or regulation is valid, a court must apply the four-part test elucidated by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89 (1987). Under *Turner*, a court is required to consider (1) whether the regulation or practice bears

a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether

prisoners have alternative ways of exercising the circumscribed right; (3) whether

accommodating the right would have a deleterious impact on other inmates; and (4) whether

alternatives exist that fully accommodate the prisoner's rights at de minimis cost to valid

penological interests. *Turner*, 482 U.S. at 89-91. "Although the *Turner* test was articulated in

the context of challenges to prison regulations, as opposed to challenges to individual conduct,

the analysis in the later context is the same." *Heleva v. Kramer*, 214 Fed. Appx. 244, 247 (3d

Cir. 2007).

The Third Circuit "ha[s] said that evaluations of prison restrictions under *Turner* require

'a contextual, record-sensitive analysis.'" *Wolf v. Ashcroft*, 297 F.3d 305, 310 (3d Cir. 2002)

(quoting *DeHart*, 227 F.3d at 59 n.8); *see Bros. v. Lawrence Cnty. Prison Bd.*, 2008 WL 146828,

at *5 (W.D. Pa. Jan. 14, 2008). First, the plaintiff has the burden of "disprov[ing] the validity of

the regulation or decision." *Lane v. Tavares*, 2016 WL 7165750, at *8 (M.D. Pa. July 12, 2016),

report and recommendation adopted, 2016 WL 7118162 (M.D. Pa. Dec. 7, 2016) (citing *Overton

v. Bazzetta*, 539 U.S. 126, 132 (2003). "This burden is 'heavy' because plaintiffs must overcome

the presumption that prison officials acted within their 'broad discretion.'" *Monroe v. Beard*, 536

F.3d 198, 207 (3d Cir. 2008) (quoting *Shaw v. Murphy*, 532 U.S. 223, 232 (2001)). Although the

inmate retains the ultimate burden of persuasion, the prison official must then justify the

regulation or decision by pointing to a legitimate government interest, and "'demonstrate' that

the policy drafters 'could rationally have seen a connection' between the policy and [that

interest]." *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006) (alteration in original) (quoting

*Wolf*, 297 F.3d at 308). "[T]his burden, though slight, must 'amount to more than a conclusory

assertion.'" *Wolf*, 297 F.3d at 308 (quoting *Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir.

1999)); *id.* ("Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement.").  If the government meets its burden, "the court considers the other three *Turner* factors, and analysis of those factors is generally 'fact-intensive.'" *Lane*, 2016 WL 7165750, at *8 (quoting *Wolf*, 297 F.3d at 310).

Here, Tootle argues that because DOC policy did not prohibit him from keeping his religious texts in his RHU cell, Long's alleged decision to deny him access to these texts was invalid.  ECF Nos. 46, p. 9; 56, p. 9.  The policy Tootle refers to is DC-ADM 801, Inmate Discipline Procedures Manual Section 6 - Disciplinary Custody Status Inmates, which states, among other things, that an inmate in the RHU "shall be permitted to maintain in his/her cell any combination of personal property that fits into one standard sized records center box." ECF No. 47-4, Ex. B, p. 6.  While this policy demonstrates that inmates may be allowed to keep some personal items with them while in the RHU, it does not speak specifically to the retention of religious materials.  Therefore, the Court turns to Long's justification.

To satisfy his burden at the first *Turner* step, Long puts-forth a single statement: "Temporarily regulating what items and quantity of items inmates may keep in their cells while in disciplinary custody is of critical penological interest." ECF No. 39, p. 11.  This assertion, while facially valid, misses the point of Tootle's claim.  Reasonably interpreted, his claim does not involve a challenge to Long's authority and right to enforce restrictions on the volume of material he possessed in the RHU.  Rather, he claims that Long would not permit him to retain or recover his religious materials among the volume of materials he was permitted under the regulation.  The Third Circuit has explained that satisfying the initial burden of the *Turner* analysis "may or may not require evidence; where the connection is obvious, common sense may suffice." *Jones*, 461 F.3d at 361 (discussing *Wolf*, 297 F.3d at 308-09).  "Whether the requisite

connection may be found solely on the basis of 'common sense' will depend on the nature of the

right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its

connection to the proffered interest." *Wolf*, 297 F.3d at 308-09.  Here, the Court cannot

determine whether the connection is obvious because Long has not identified a penological

interest nor clarified under what DOC policy or regulation he acted.  And because the Court is

unable to "state[] or describe[] the interest purportedly served by the prison policy," it cannot

"determine whether the interest was neutral and legitimate." *Id.*, at 308 (Third Circuit held that

"the [district court's] opinion was deficient in that it never stated or described the interest

purportedly served by the prison policy, nor did it determine whether the interest was neutral and

legitimate.").  Long's statement is therefore insufficient to support summary judgment in his

favor.  *See Ramirez v. Pugh*, 379 F.3d 122, 130 (3d Cir. 2004) ("Determining whether there is a

rational link between sexually explicit material and the harms toward which the government's

overall rehabilitative efforts are directed requires more than a conclusory assertion that the

'consumption of [sexually explicit] publications [ ] implicitly elevate[s] the value of the viewer's

immediate sexual gratification over the values of respect and consideration for others' and a

generalized statement that sexual self-control is relevant to the rehabilitation of the entire class of

federal prisoners."); *Jones v. Brown*, 461 F.3d at 361 (When neither common sense nor evidence

demonstrates a reasonable causal nexus-'where the logical connection between the regulation

and the asserted goal is so remote as to render the policy arbitrary or irrational' or to demonstrate

that the regulation 'represents an exaggerate[d] response'-summary judgment for the defendant

administrator is inappropriate and the plaintiff inmate may be entitled to injunctive relief.");

*Bieregu v. Reno*, 59 F.3d 1445, 1458 (3d Cir.1995); *Mann v. Reynolds*, 46 F.3d 1055, 1060-61

(10th Cir.1995).

Finally, the Court notes that disputed issues of material fact also preclude summary judgment for Tootle.  Among other things, Long denies that he removed Tootle's religious materials from the possessions transferred to Tootle's RHU cell or otherwise prohibited Tootle from having his religious materials in his RHU cell, and he further denies that Tootle requested that he return these materials.  There is also evidence in the record to support a finding that Tootle packed his own possessions without Long's involvement.

## III.    Conclusion

For the reasons stated herein, it is respectfully recommended that Long's motion for summary judgment (ECF No. 38) be denied and that Tootle's motion for summary judgment (ECF No. 45) also be denied.

## IV.    Notice

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, the parties may seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. *See* Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive appellate rights.  *See Brightwell v. Lehman*, 637 F.3d 187, 194 n.7 (3d Cir. 2011); *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007).

DATED this 31st day of October, 2022.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE